FILED

2005 Oct-17  PM 02:15
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| MARIO WASHINGTON, | ) | |
| PLAINTIFF, | ) | |
| VS. | ) | **5:03-cv-00503-VEH** |
| THE KROGER CO., | ) | |
| DEFENDANT. | ) | |

## MEMORANDUM OF DECISION

The court has before it the March 18, 2004 motion of defendant The Kroger Co. for summary judgment. Pursuant to the court's March 29, 2004 and April 28, 2004 orders, the motion was deemed submitted, without oral argument, on May 17, 2004.

## I. Procedural History

Plaintiff Mario Washington commenced this action on March 7, 2003 by filing a complaint in this court alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., as amended by the Civil Rights Act of 1991, and 42 U.S.C. § 1981. Plaintiff contends that defendant's alleged conduct constitutes (1) racial harassment, (2) retaliation, and (3) constructive discharge. Defendant's March 18, 2004 motion for summary judgment asserts that plaintiff

has failed to establish a prima facie case as to all claims and that defendant, therefore, is entitled to summary judgment.

Both parties have filed briefs and submitted evidence in support of their respective positions.  On March 18, 2004, Defendant submitted a brief and evidence[1] in support of its motion for summary judgment.  On April 23, 2004, plaintiff filed a brief and evidence[2] in opposition to defendant's motion for summary judgment.  On May 17, 2004, defendant filed a brief and evidence[3] in reply to plaintiff's response in opposition.

## II. Standards for Evaluating a Summary Judgment Motion

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper

---

[1] The defendant submitted the following evidence: affidavit of Fred Gatson; affidavit of Gary Hood; excerpts of the deposition of Mario Washington; excerpts of the deposition of Donald Hawkins; excerpts of the deposition of Gary Hood; excerpts of the deposition of Peggy Prescott; excerpts of the deposition of Richard Shotts; Kroger Employee Handbook; documents produced by Jerry Damson Ford; Washington's employment application and resume submitted with application; Washington's management program application and resume submitted with application; Kroger's harassment policy; Kroger's policy on violence in the workplace; acknowledgment form from Washington regarding violence in workplace policy; Kroger's Associate and Safety Handbook; Kroger's Collective Bargaining Agreement; Washington's handwritten statement regarding 09/01/01 incident; Washington's typewritten correspondence regarding 09/01/01 incident; 03/07/02 letter from Gatson to Washington; 04/05/02 letter from Gatson to Washington; 05/28/02 letter from Prescott to Washington; Washington's letter of resignation; and 02/15/02 letter regarding Washington's outstanding customer service.

[2]  The plaintiff submitted the following evidence: deposition of Mario Washington; deposition of Gary Hood; deposition of Donald Henry Hawkins; deposition of Peggy Prescott; deposition of Richard Shotts; and Anti-Harassment policy.

[3] The defendant submitted the following evidence in reply: Kroger Harassment Policy; and handwritten notes regarding meetings and investigation following 09/01/01 incident.

"if the pleadings, depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law."

Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman v. AI Transport, 229

F.3d 1012, 1023 (11th Cir. 2000).  The party asking for summary judgment always

bears the initial responsibility of informing the court of the basis for its motion and

identifying those portions of the pleadings or filings which it believes demonstrate

the absence of a genuine issue of material fact.  Celotex Corp., 477 U.S. at 323.

Once the moving party has met his burden, Rule 56(e) requires the nonmoving

party to go beyond the pleadings and by his own affidavits, or by the depositions,

answers to interrogatories, and admissions of file, designate specific facts showing

that there is a genuine issue for trial.  Id. at 324.

The substantive law will identify which facts are material and which are

irrelevant. Chapman, 229 F.3d at 1023; Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 248 (1986).  All reasonable doubts about the facts and all justifiable

inferences are resolved in favor of the non-movant. Chapman, 229 F.3d at 1023;

Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is

genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." Anderson, 477 U.S. at 248; Chapman, 229 F.3d at 1023.  If

3

the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249. The method used by the party moving for summary judgment to discharge its initial burden depends on whether that party bears the burden of proof on the issue at trial. See Fitzpatrick, 2 F.3d at 1115-17 (citing United States v. Four Parcels of Real Property, 941 F.2d 1428 (11th Cir. 1991) (en banc)). If the moving party bears the burden of proof at trial, then it can only meet its initial burden on summary judgment by coming forward with positive evidence demonstrating the absence of a genuine issue of material fact; i.e. facts that would entitle it to a directed verdict if not controverted at trial. Fitzpatrick, 2 F.3d at 1115. Once the moving party makes such a showing, the burden shifts to the non-moving party to produce significant, probative evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial. Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

4

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to affirmatively show the absence of evidence in the record to support a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  Fitzpatrick, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point out to the court record evidence, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no longer rest on mere allegations, but must set forth evidence of specific facts.  Lewis v. Casey, 518 U.S. 343, 358 (1996) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 561 (1992)).

### III. Relevant Undisputed Facts[4]

Washington began his employment with Kroger on May 3, 2000 as a store clerk in the meat department at Kroger Store 508 in Huntsville, Alabama. (Pl. Dep. at 65-66, 105, 109, 147-49, 267.) He remained in the meat department until approximately February 2002. (Id. at 148-49, 172-73.)

The store manager during the relevant time period was Don Hawkins, (id. at 163-165; Hawkins Dep. at 5), and the assistant store managers were Phillip Clark and Rick Shotts. (Pl. Dep. at 164-165; Shotts Dep. at 7-8.) Phillip Farmer was the Zone Manager for the zone encompassing Store 508, (Hawkins Dep. at 6), and Fred Gaston served as Manager of Labor Relations for the Nashville Kroger Marketing Area (KMA), which included Store 508 from the time of Washington's initial employment until April 30, 2002. (Gaston Aff. ¶ 2.)

Managers at the store level are responsible for addressing human resources issues. (Prescott Dep. at 9.) If necessary, managers at the store level may seek assistance from the Zone Manager or from the Human Resources department, but are not required to do so. (Id. at 10-11; Gaston Aff. ¶ 9; Shotts Dep. at 6-7.)

Gary Hood, an hourly employee and union steward, supervised Washington

---

[4]     Facts are undisputed unless otherwise expressly noted.    If the facts are in dispute, they are stated in the manner most favorable to the plaintiff.  See Fitzpatrick, 20 F.3d at 1115.

in the meat department.  (Hood Aff. ¶ 2-3; Hood Dep. at 4, 26.)  Hood was the

"Head Meat Cutter" at Store 508.  (Hood Dep. at 4.)  Although Hood was

Washington's supervisor, Hood was not a member of Kroger management. (Hood

Aff. ¶ 2; Pl. Dep. at 164-65; Def.'s Ex. 18 at 8, 23; Hood Dep. at 4, 26.)

### A.  Incidents Before September 1, 2001

Washington contends that his co-worker, Randie Dean, repeatedly harassed

him based on his race.  Before the culminating incident on September 1, 2001,

Washington alleges that Dean harassed him in the following ways:

- Dean threatened Washington's wife by threatening "to duct tape his
  wife and have sex with her."  (Pl. Dep. at 149, 152.)  Washington "did
  not know where [the comment] came from" and told Dean that he
  "did not like that type of conversation and talk."  (Id. at 178.)
  Washington testified that he told Hood about Dean's comment.  (Id.
  at 160.)

- "Somewhere in the middle of [2001]," Dean called Washington a
  "motherfucker."  (Id. at 149, 156, 158, 179.)  Washington testified
  that Dean called him this name at least ten times.  (Id. at 155.)

- "Somewhere in the middle of [2000]," Dean called him "boy" and
  "nothing."  (Id. at 149-50, 156-57.)  Washington testified that Dean

7

called him "boy" "pretty often."  (<u>Id.</u> at 156.)  For instance,
Washington testified that one time when he was working with Dean
wrapping and cutting meat, Dean "yelled out," "hey, boy do this . . .
do that."  (<u>Id.</u> at 180.)  Washington testified that he spoke with Hood
about Dean's actions.  (<u>Id.</u> at 159-60.)

• "Somewhere after the middle of [2001]," Dean told him he would
"chop [him] up in the meat grinder."  (<u>Id.</u> at 150, 157.)

• In 2001, Dean held "a knife up in the air, pointing it at
[Washington]."  (<u>Id.</u> at 150, 157-58.)

• In July or August 2001, Dean put on Washington's jacket and told
him that he would take his jacket from him.  (<u>Id.</u> at 150, 165.)
Washington told Dean to remove his jacket and went to get Hood.
(<u>Id.</u> at 165-66.)   Before Washington returned, Dean removed the
jacket.  (<u>Id.</u> at 166.)

Washington did not report any of the above alleged incidents to Hawkins,
Shotts, or any other store manager before September 1, 2001.  (<u>Id.</u> at 222-25;
Hawkins Dep. at 18-19.)  He did, however, complain to Hood, his immediate
supervisor, about some of the incidents.  (Pl. Dep. at 159-64.)  Washington
estimated that he complained to Hood every week.  (<u>Id.</u> at 224.)

8

### B.  September 1, 2001 Incident

Sometime before September 1, 2001, Plaintiff brought a plastic figurine into the back stock area, near the meat department.  (Pl. Dep. at 167-68, 170, 193; Hood Dep. at 18-19.)  He brought the figurine from the pharmacy to the meat department and suggested to Hood that it could be used for a display.  (<u>Id.</u> at 18.) The figurine did not have a head and neck; instead, it had a loop on the top of the torso of the figure where the head should have been.  (Pl. Dep. at 186; Prescott Dep. at 58-60; 64.)  Sometime before September 1, 2001, Dean drew a tie on the figurine, at the top of the torso and beneath the loop, and wrote the words "Mario Man" on the torso.  (Pl. Dep. at 168-69; Shotts Dep. at 20-22; Hood Dep. at 19-20.)

On September 1, 2001, as Washington walked into the meat wrapping area, he saw the figurine suspended by a string in the backroom near the meat department.  (Pl. Dep. at 183.)  The string used to suspend the figurine was tied to the top of the loop and not at the base of the loop where the tie had been drawn. (Id. at 186-87.)  The string was two to three feet of twine, which is used in the meat department to wrap meat packages. (<u>Id.</u> at 186-87, 192-93; Shotts Dep at 24.) Added to the figurine's torso were the word "You want Sundays off – It's all in your head."  (Pl. Dep. at 187, 201-02.)  Plaintiff testified that he understood these

9

words as referring to his request not to work on Sundays so he could attend church.  (Id. at 187-88, 198-99.)  Washington took a picture of the suspended figurine.  (Id. at 183, 185, 194-95.)

*C.  Investigations of September 1, 2001 Incident*

After he discovered the figurine, Washington went to the assistant manager, Shotts, to report his concern.  (Id. at 188, 196; Shotts Dep. at 22.)  After he told Shotts about the figurine, Shotts immediately went to the meat department and removed it.  (Pl. Dep. at 196-99.)  The figurine was placed in a closed cabinet in the manager's office, and subsequently given to Gaston.  (Hawkins Dep. at 19, 22-23;  Hood Dep. at 21.)

On the same day the incident occurred, Shotts investigated and Dean admitted suspending the figurine. (Pl. Dep. at 188-190; Shotts Dep. at 22-23.) Shotts then met with Union Steward Debbie Johnson, Dean and Washington to discuss the issue.  (Pl. Dep. at 188-89; Hawkins Dep. at 21-22; Shotts Dep. at 24-25.)  Dean explained to Shotts that he suspended the figurine as a "dig" at Washington because Washington requested to have Sundays off.[5]  (Shotts Dep. at 25.)  Shotts told Dean that the display could have been perceived as racial

---

[5] Plaintiff requested not to work on Sundays by leaving a note on a desk where employees in the meat department put on their smocks and complete paperwork. (Hood Dep. at 16-17.)

harassment.  (Id. at 25-26.)  Shotts reprimanded Dean and explained that his actions were inappropriate and would not be tolerated.  (Pl. Dep. at 264; Hawkins Dep. at 21-22; Shotts Dep. at 25; Hood Dep. at 11-12; Prescott Dep. at 77-78.) Shotts went over Kroger's policy about violence in the workplace.  (Shotts Dep. at 25-26.)  Washington did not say anything in the meeting.  (Id.)  After the meeting, Washington returned to work and finished his workday.  (Pl. Dep. at 206; Shotts Dep. at 32.)

Approximately two days later, Hood met with Washington and Dean to discuss the incident.  (Pl. Dep. at 209-10; Hood Dep. at 22-24.)  Dean apologized for his actions, but Washington did not believe that the apology was sincere.  (Pl. Dep. at 191-92, 204-05, 210.)  Hood told Washington that Dean's actions "were a dumb thing to do."  (Pl. Dep. at 211.)   Hood testified that he told Dean that his actions were inappropriate and would not be tolerated.  (Hood Dep. at 11-12; 22-24, 26.)  Washington also spoke to Hawkins, the store manager, about the events of September 1, 2001. (Pl. Dep. at 207; Hawkins Dep. at 23-24.) Washington did not tell Hawkins about any other concerns he had about Dean. (Pl. Dep. at 223.)   On September 10, 2001, Hawkins held another meeting with Washington and Dean to discuss the incident.  (Pl. Dep. at 208; Hawkins Dep. at 25-26.)  Also present at the meeting were Business Agent Wayne Phillips (African

11

American) and three union stewards who were all African American.  (Pl. Dep. at 208.)  During this meeting, Washington stated he wanted Kroger to terminate.  (Pl. Dep. at 214.)  Phillips told him that Dean could not be terminated for this incident.[6]  (Pl. Dep. at 214-15.)  Hawkins sternly warned Dean that he should not engage in any further actions toward Washington: "As far as I was concerned, he was in real deep, and whether he intended anything wrong by it or not, it offended Mario and the offense to Mario better stop promptly."  (Hawkins Dep. at 26-27.) Hawkins did not place a formal "Constructive Advice" warning in Dean's file, but testified that his notes about the incident were "written notices in [Dean's] file." (Id. at 26-27.)  Hawkins told Washington that if he had any concerns about Dean he could and should bring them to Hawkins.  (Id. at 37-38.)

Sometime after the meeting with Shotts on September 1, 2001, and the meeting with Hood two days later, Washington sought to meet with Zone Manager Phillip Farmer.  (Pl. Dep. at 216-17, 229.)  Washington sent an official letter of complaint to Farmer's office. (Def. Ex. 20.)  The letter referred only to the September 1, 2001 incident involving Dean.  Farmer told Washington that someone from Nashville would call him to discuss the incident.  (Pl. Dep. at 230.)

---

[6] Although Washington could not recall why Kroger could not terminate Dean, the collective bargaining agreement would not allow for his termination.  (See Def. Ex. 18.)

Farmer contacted Gaston, whose office was in Nashville, and asked him to speak with Washington about his complaint.  (Gaston Aff. ¶ 7.)  Farmer informed Gaston that store management, in consultation with the union, had resolved the complaint, but that Washington did not appear satisfied with the results.  (Id. ¶ 8.)  Gaston understood that Washington's complaint had been investigated, and that Dean had been reprimanded about his actions.  (Id.  ¶ 8.)  Farmer explained to Gaston that he wanted Gaston to work with Washington to help him reach a resolution.  (Id. ¶ 10.)

Gaston called Washington to set up a meeting, within a week or two after the incident.  (Pl. Dep. at 230-31.)  In late September or early October 2001, Gaston met with Washington for one to two hours; they discussed the incident on September 1, 2001, and Washington showed Gaston a picture of the suspended figurine. (Id. at 231-32.)  Gaston asked Washington to describe his concerns. (Gaston Aff. ¶ 14.)  After Washington described the events of September 1, 2001, Gaston asked him if any other, previous incidents or actions had occurred.  (Id. ¶¶ 14-15.)  Although Washington denied that anyone ever used the "n-word" or called him "Negro" (id. ¶ 14), Washington told Gatson that Dean had "called [him] motherfuckers, and [Dean] threatened [Washington's] wife stating that he will duct tape her and do sexual acts to her."  (Pl. Dep. at 235.)  At the conclusion

13

of the meeting, Gaston told Washington that he would review the store

management's investigation.  (Gaston Aff. ¶ 17.)  According to Washington,

Gatson told him that the incident "was borderline."  (Pl. Dep. at 233.)

Gaston then spoke with management employees and learned more about the

investigation and disciplinary meetings that had occurred.  (Gaston Aff. ¶ 18.)

Among other things, Gaston learned that the meat department's more senior

employees, including Dean, were concerned about the impact on them of

Washington's request to not work on Sundays.  (Id. ¶ 19.)  Gaston also learned

that Shotts had immediately investigated the incident, had verbally reprimanded

Dean, and that Hawkins had other disciplinary meetings with Dean.  (Id. ¶ 20.)

Gaston was satisfied that the situation had been resolved appropriately.[7]  (Id. ¶ 21.)

Gaston next worked with Hawkins to follow up on some additional

allegations made by Washington concerning  Dean's comments regarding his wife.

(Id. ¶ 22.)  Though Dean was on medical leave, Hawkins and Philips met with

Dean on November 9, 2001 to discuss these allegations.  (Id. ¶ 23.)  During this

meeting, Dean was again reprimanded regarding his conduct toward Washington,

---

[7]Gaston spoke with Farmer and explained that he did not see the incident as racially motivated and that he was satisfied with the actions that he and the store management had taken. (Gaston Aff. ¶ 25.)  Farmer agreed with Gaston, and asked him to talk again with Plaintiff to help him come to resolution.  (Id.)

and was warned that any further action could result in termination.  (Id.)

Gaston again met with Washington in November 2001.  (Pl. Dep. at 236; Gaston Aff. ¶ 26.)   Co-Manager Diane Watts, who is African American, also attended this meeting.  (Id.; Pl. Dep. at 237.)  Gaston told Washington that if he had any further problems, he could bring his concerns directly to Watts.  (Pl. Dep. at 238; Gaston Aff. ¶ 26.)  Gaston also told Washington that Dean was disciplined for his conduct on September 1, 2001.  (Pl. Dep. at 252; Gaston Aff. ¶ 27.)  Gaston said that he believed that the investigation and discipline were appropriate. (Gaston Aff. ¶ 27.)  Gaston reminded Washington that Dean's action did not constitute a terminable offense under Kroger policy or the collective bargaining agreement.  (Id.)  Washington then stood up, excused himself and left the meeting. (Id. ¶ 28.)

On February 25, 2002, Washington left a telephone message with the human resources department.  (Def. Ex. 21.)  On March 7, 2002, Gaston wrote Washington a letter in response to his message.  (Id.) The letter explained that Kroger was attempting to conclude their investigation and that Gaston could "understand why certain placements of a string" around a figure could be offensive. (Gaston Aff. ¶ 30; Def. Ex. 21.)  Gaston and other employees, however, believed that the string was not tied in a manner that could be construed as

15

discriminatory or inflammatory.  (Id.)  To assist in reaching resolution, Gaston

asked Washington to give him the picture (or a copy) that Washington had shown

to Gaston during their first meeting regarding the September 1 incident (and that

Gaston had previously requested in January 2002).  (Id.)  Gaston stated that if he

had not received the letter by March 15, 2002, he would assume "that the

placement of the string is neither inflammatory nor discriminatory."  (Def. Ex. 21.)

Having heard no response, on April 5, 2002, Gaston again wrote

Washington and asked for the picture.  (Gaston Aff. ¶ 32; Def. Ex. 22.)  Gaston

stated that he could not understand why Washington would refuse to cooperate

with his investigation.  (Def. Ex. 22.)  He asked Washington to provide the picture

by April 15, 2002, or he would conclude his investigation.  (Id.)

Sometime in late May 2002, after Gaston's employment had ended, Peggy

Prescott, the manager of human resources for the Atlanta KMA, received the

picture from Washington.  (Def. Ex. 23; Prescott Dep. at 49-50.)  She discussed

the matter with Gaston, and, on May 28, 2002, sent a letter to Washington.  (Id.)

That letter detailed Kroger's investigation of the events of September 1, 2001, and

explained that the matter was closed.  (Id.)

Washington testified that after September 1, 2001, no one at Kroger treated

him in a racially harassing or discriminatory manner.  (Pl. Dep. at 266.)   Dean left

16

Kroger on medical leave on September 21, 2001.  (Pl. Dep. at 235-36, 252-53; Shotts Dep. at 13.)  After Dean went on medical leave, Washington and Dean never worked together again (Pl. Dep. at 252-53.)  Further, after Dean's leave of absence expired, his employment was terminated.  (Pl. Dep. at 253.)

   *D.  Restructuring of Nashville KMA and Washington's Reassignment*

   On December 11, 2001, Kroger announced the dissolution of the Nashville KMA, of which Store 508 was a part, and the merger of some of the stores from that area with the Atlanta KMA.  (Gaston Aff. ¶ 3; Prescott Dep. at 17-20, 22-26.) After the dissolution of the Nashville KMA, from December 11, 2001 until April 30, 2002, Gaston worked to transition the labor relations and human resources matters to the Atlanta KMA.  (Gaston Aff. ¶ 4.)  As of February 2, 2002, Store 508 officially became a part of the Atlanta KMA and under the supervision of Prescott, Manager of Human Resources for the Atlanta KMA.  (Gaston Aff. ¶ 5; Prescott Dep. at 5, 8, 9.)

   As a result of the dissolution of the Nashville KMA and Kroger's focus on cutting costs, the stores in the dissolved Nashville KMA, including Store 508, were required to cut the number of hours available for employees to work at each store.  (Gaston Aff. ¶ 6; Hood Aff. ¶ 4;Prescott Dep. at 22-26; Hawkins Dep. at 38; Shotts Dep. at 12.)  According to Kroger, because of the cuts in store hours,

Washington's seniority and his unavailability to work certain hours in the meat department, Washington was reassigned to work in the front of the store where he worked as a cashier and bagged groceries, among other things, where Kroger could be more flexible in assigning Plaintiff hours of work.  (Hood Aff. ¶ 5; Hawkins Dep. at 10-13, 34-36, 38; Shotts Dep. at 12-13, 33-34; Hood Dep. at 7-10.)  Washington did not file a grievance with the union contesting the change in his assignment.  (Prescott Dep. at 28-32.)  He also did not discuss the change in his work assignment with Hood, any member of store management, or a union representative. (Pl. Dep. at 173, 176.)

### E.  Washington's Resignation

On August 21, 2002, Washington voluntarily resigned.  (Def. Ex. 24; Pl. Dep. at 275-76.)  His resignation letter stated that he was resigning because he "accepted a challenging position with an opportunity to further [his] career goals." (Def. Ex. 24.)  Washington also stated that (a) it was his "genuine pleasure to work for the company;" (b) he had "enjoyed working with the company's fine staff of professionals and colleagues;" (c) he would "miss his association with Kroger;" and (d) he would remain employed for another 2 weeks in order to train his replacement. (Def. Ex. 24; Pl. Dep. at 276-77.)   On August 22, 2002, he began working for Jerry Damson Ford as an automobile sales person where he earns

18

more than double his Kroger annual earnings.  (Def. Ex. 9; Pl. Dep. at 277-80.)

Washington was never disciplined regarding his work performance between September 1, 2001 and his resignation in August 2002.  (Pl. Dep. at 242.)  In fact, both before and after September 1, 2001, Kroger recognized and awarded his work performance in the area of customer service.  (Def. Exs. 25, 26; Pl. Dep. at 243-45, 281-82.)  Moreover, Washington applied for and was selected to interview for a position in Kroger's management training program with Zone Operations Manager Kurt Hohl.  Although Hohl told Washington he was a good candidate, (Def. Exs. 12, 13; Pl. Dep. at 274-75; Prescott Dep. at 36-39) Washington resigned before he received any written feedback regarding whether he would be admitted into the management training program.  (Pl. Dep. at 274-75.)

E.  *Relevant Kroger Policies and the Collective Bargaining Agreement*

Kroger's policies prohibit racial harassment, provide examples of conduct that are considered to be a violation of policy,  (Def. Ex. 14; Def. Ex. 17 at 21; Pl. Dep. at 117-118), identify persons to whom employees should complain about hostile or offensive acts, (Def. Ex. 14; Pl. Dep. at 118-119), and provide a help-line telephone number for reporting violations.  (Def. Ex. 14; Pl. Dep. at

119.)  Although Washington produced a copy of the employee handbook[8] policies

to the defendant in the course of this litigation, Washington testified that he could

not recall whether or not he knew that Kroger had a policy against harassment.

(Id. at 120.)  The record is silent as to whether Washington actually received a

copy of this policy or whether he received any training related to this policy.

Kroger's policy against workplace violence also prohibits workplace

harassment and prejudice.  (Def. Ex. 15; Pl. Dep. at 124.)   This policy encourages

employees to report any acts they believe violate the policy.  (Def. Ex. 15; Pl. Dep.

at 124.)  It provides employees with the option of reporting inappropriate conduct

to members of management or, alternatively, to call a toll free number for an

employee assistance program, "Resources for Life." (Def. Ex. 15; Pl. Dep. at 124.)

Washington received Kroger's policy against workplace violence and signed an

acknowledgment form.  (Def. Ex. 16; Pl. Dep. at 122, 128.)

Store 508 also utilizes a Kroger Associate and Safety Handbook, which

contains Kroger's store rules and regulations requiring employees and managers to

---

[8]  The court notes that the employee handbook specifically discusses sexual harassment, but does not specifically mention racial harassment.  The handbook does state that Kroger does not discriminate on the basis of race in "recruiting, hiring, promoting, and all other terms and conditions of employment" and that "The Kroger Co. is committed to a workplace free from all forms of discrimination (race, color, religion, national origin, age (40 and over), sex or gender, and citizenship, or any other legal [sic] discrimination), including sexual harassment."  (Def. Ex. 8.)

treat each other with fairness, respect, openness and honesty.  (Def. Ex. 17 at 13;

Pl. Dep. at 130-31.)  The handbook includes Kroger's policy against sexual

harassment and discrimination and warns that violations could result in

disciplinary action up to and including discharge.[9]  (Def. Ex. 17 at 21-22; Pl. Dep.

at 130-31.)  Washington testified that he "may have" received a copy of this

handbook.  (Pl. Dep. at 133.)

Because Plaintiff was a non-management employee, the collective

bargaining agreement governed the terms and conditions of his employment.

(Def. Ex. 18; Pl. Dep. at 134-37.)  According to the CBA, work assignments are

based on seniority, including the right to work or not to work on Sunday.  (Def.

Ex. 18 at 7, 9-11; Pl. Dep. at 140-41, 143-44.)  The CBA expressly prohibits racial

harassment and discrimination.  (Def. Ex. 18 at 4; Pl. Dep. at 137.)

Under the CBA, employees hired before November 1, 1997 were assigned

to particular departments and could not be required to work outside their assigned

department.  (Def. Ex. 18 at 15; Pl. Dep. at 148.)   Employees hired as store clerks

after November 1, 1997, however, such as Washington, could be assigned to work

in any department.  (Def. Ex. 18 at 15-16; Hawkins Dep. at 9-10.)  In addition,

---

[9] The Safety Handbook contains the same information as the employee handbook.  It does not specifically mention racial harassment; it only defines and details procedures for sexual harassment.  (Def. Ex. 17.)

employees hired after November 1, 1997 could be automatically disqualified as full-time employees if they worked fewer than 38 hours per week for twelve consecutive weeks.  (Def. Ex. 18 at 32-35.)

## IV. Applicable Substantive Law and Analysis

Plaintiff's complaint contains the following claims: (1) a hostile work environment based on race in violation of Title VII and § 1981; (2) retaliation in violation of Title VII and § 1981; and (3) constructive discharge in violation of Title VII and § 1981.  Kroger's motion for summary judgment and brief in support of that motion contend that Washington cannot establish a prima facie case of racial harassment, retaliation and constructive discharge.  The court will address each claim separately.

### A. Hostile Work Environment

Washington contends that he was subject to racial harassment by his co-worker, Randie Dean, in the meat department in violation of Title VII and § 1981.[10]  A hostile work environment claim under Title VII is established upon proof that "the workplace is permeated with discriminatory intimidation, ridicule,

---

[10] Both of these statutes have the same requirements of proof and use the same analytical framework.  The court, therefore, will explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well.  Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998).

and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993). The Eleventh Circuit has repeatedly instructed that a plaintiff wishing to establish a hostile work environment claim must show: (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as race; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability. See, Mendoza v. Borden , 195 F.3d 1238, 1245 (11th Cir. 1998) (applying these factors in the context of a hostile environment sexual harassment claim).  Kroger does not dispute that Washington belongs to a protected group, and, for purposes of the motion for summary judgment only, that the alleged actions were unwelcome.  Rather, Kroger asserts that Washington failed to present substantial evidence to support findings in his favor on the second, fourth and fifth elements. The court considers these elements in turn.

1.  Based on Race

Kroger first argues that the alleged harassment was not based on race.  (Def.

23

Br. at 22-25.)   The court agrees that most of the alleged harassment was not based on race.  Although rude and offensive, most of the comments made by Dean before the incident on September 1, 2001 were not based on race.  The only comments that could potentially be based on race are where Dean referred to Washington as "boy."  In addition, Washington has raised a genuine issue of material fact as to whether the figurine incident on September 1, 2001 was based on race.

Although the court must examine the statements and conduct complained of collectively to determine whether they were sufficiently pervasive or severe to constitute racial harassment, see Mendoza, 195 F.3d at 1242, the statements and conduct must be of a racial nature "before they are considered in determining whether the severe or pervasive requirement is met."  Gupta v. Florida Bd. of Regents, 212 F.3d 571, 583 (11th Cir. 2000).  "Innocuous statements or conduct, or boorish ones that do not relate to the [race] of the actor or of the offended party, . . . are not counted."  Id.  Because the court finds that only the "boy" comments and the figurine incident could possibly be related to Washington's race, the court will not consider any of the other alleged behavior in the remainder of its analysis. See id.

24

2.  <u>Severe and Pervasive</u>

To determine whether harassment was sufficiently severe and pervasive to alter Washington's terms and conditions of employment, the court considers the following four factors: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." <u>Allen v. Tyson Foods</u>, 121 F.3d 642, 647 (11th Cir. 1997) (citing and applying <u>Harris</u>, 510 U.S. at 23).  In addition, the employee must meet both a subjective and objective test.  <u>See</u> <u>Mendoza</u>, 195 F.3d at 1246.  The employee must establish not only that she subjectively perceived the environment as hostile, but also that a reasonable person would perceive the environment to be hostile and abusive.  <u>Watkins v. Bowden</u>, 105 F.3d 1344, 1355-56 (11th Cir. 1997).  The objective severity of harassment should be judged from the perspective of a reasonable person in the employee's position, considering all the circumstances.  <u>Id.</u>

After careful consideration of the entire record, the court concludes that the comments and conduct alleged by Washington does not meet the minimum threshold of conduct sufficiently severe or pervasive to alter his working conditions.  As to the frequency of the conduct, the figurine incident was an

isolated incident that was immediately taken down after Washington notified

Shotts.  Washington testified that Dean called him "boy" "pretty often," but it is

impossible to ascertain by the record the frequency of those comments. At his

deposition, Washington recalled one conversation in which Dean called him "boy"

in the almost year and a half that he had been working with Dean in the meat

department.  In addition, Washington testified that, after September 1, 2001, he

did not experience any harassment of any kind.  The record, therefore, does not

reflect that the alleged harassment was particularly frequent.

    As to the second and third considerations, the court recognizes the severity,

offensiveness and physically-threatening implication that the hanging figurine

had.  No matter the real reason for Dean's actions, a jury could easily see this

incident as depicting a hanging.  Even so, Washington presented no evidence to

the court that the few minutes that the figurine was hanging had any effect on his

work performance.  Instead, the record indicates the opposite.  It is undisputed that

both before and after September 1, 2001, Kroger recognized and awarded

Washington for his work performance in the area of customer service.  In addition,

Washington applied for and was selected to interview for a position in Kroger's

management training program with Zone Operations Manager Kurt Hohl.

    Allowing Washington's hostile environment claims to go forward would be

26

dishonest to the longstanding proposition that Title VII is not a federal "civility

code."  Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75 (1998).

Construing the facts in the light most favorable to Washington in the totality of the

circumstances, the actions complained of by Washington were not sufficiently

severe or pervasive to alter his terms or conditions of employment.  Kroger,

therefore, is entitled to summary judgment as to this claim.[11]

## B.  Retaliation

In general, a plaintiff may attempt to establish a claim of illegal employment

discrimination through the use of direct evidence, circumstantial (indirect)

evidence, or statistics.  See id.; see also Schoenfeld v. Babbitt, 168 F.3d 1257,

1266 (11th Cir. 1999) (recognizing the availability of either direct or

circumstantial evidence).  Here, it is undisputed that plaintiff has presented only

circumstantial evidence of retaliation and constructive discharge.  "In evaluating

Title VII claims supported by circumstantial evidence, [the courts of this circuit]

use the now-familiar framework established by the United States Supreme Court

in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d

---

[11]   Even if the harassment was severe and pervasive, the court concludes that Washington
has failed to establish a method for holding Kroger liable for the acts of Dean.  Kroger's remedial
efforts were both timely and reasonably likely to prevent the conduct underlying Washington's
complaint from recurring.  (See Section III.C.)

27

668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S.

248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)." Combs v. Plantation Planters, 106

F.3d 1519, 1527 (11th Cir. 1997).  Under the McDonnell Douglas and Burdine

framework, the plaintiff first has the burden of establishing a prima facie case of

discrimination, which creates a rebuttable presumption that the employer acted

illegally.  See id. at 1527-28.  The methods of presenting a prima facie case, as

well as the exact elements of the case, are not fixed; rather they are flexible and

depend to a large degree upon the facts of the particular situation.  See, e.g., Nix v.

WLCY Radio/Rahall Communications, 738 F.2d 1181, 1185 (11th Cir. 1984);

Lincoln v. Bd. of Regents of Univ. Sys., 697 F.2d 928, 937 (11th Cir. 1983).  In

general, a plaintiff establishes a prima facie case of disparate treatment

employment discrimination by showing that he or she was a qualified member of a

protected class and was subjected to an adverse employment action but that

otherwise similarly situated employees outside the plaintiff's class were treated

dissimilarly.[12]  See McDonnell Douglas, 411 U.S. at 802 (hiring); Holifield v.

Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (discipline); see also Nix, 738 F.2d at

1185 (discipline); Pittman v. Hattiesburg Mun. Separate Sch. Dist., 644 F.2d 1071,

---

[12] See also McDonnell Douglas, 411 U.S. at 802 n.13 ("The facts necessary will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not applicable in every respect in different factual situations.").

1074 (5th Cir. 1981) (wages).

Once the plaintiff has shown a prima facie case and, thereby, has raised the presumption of discrimination, the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions.[13]  See Rojas, 285 F.3d at 1342; Combs, 106 F.3d at 1528.  The employer "need not persuade the court that it was actually motivated by the proffered reasons."  Burdine, 450 U.S. at 254-55; see Chapman, 229 F.3d at 1024.  If the employer satisfies that burden by articulating one or more such reasons, then the presumption of discrimination falls and the burden of production again shifts to the plaintiff to offer evidence sufficient for a reasonable jury to conclude that the employer's supposedly legitimate reason is merely a pretext for illegal discrimination.[14]  Where the defendant articulates multiple, reasonable, legitimate and nondiscriminatory reasons, plaintiff must rebut each of defendant's proffered reasons.  See Chapman, 229 F.3d at 1024-25.  Although the prima facie case is irrelevant once the employer has offered a legitimate reason for its actions, the evidence of pretext

---

[13]  See Chapman, 229 F.3d at 1032 (A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which the employer based its subjective opinion.).

[14]  If the proffered reason is one that might motivate a reasonable employer, a plaintiff cannot recast the reason but must meet it head on and rebut it.  Simply quarreling with that reason is not sufficient.  Chapman, 229 F.3d at 1030.

may include the same evidence offered to establish the prima facie case.  <u>See</u> <u>Combs</u>, 106 F.3d at 1528.

Despite this shifting of the burden of production between the plaintiff and the defendant under the <u>McDonnell Douglas</u> and <u>Burdine</u> framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff."  <u>Burdine</u>, 450 U.S. at 253.  Given that the ultimate burden of persuasion always lies with the employee, a plaintiff may prevail on an employment discrimination claim and may also defeat a summary judgment either by proving that intentional discrimination did indeed motivate the defendant or by producing sufficient evidence to allow a rational trier of fact to disbelieve the employer's proffered legitimate reasons, thus permitting but not compelling the trier of fact to make a finding of illegal discrimination.  <u>See</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 147-48 (2000) (the production of the necessary sufficient evidence by plaintiff will not always prevent the employer from prevailing on a Rule 50 motion and suggesting that the strength of plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other properly considered evidence that supports the employer's case are among other

factors to take into account in evaluating a Rule 50 motion);[15] St. Mary's Honor

Ctr. v. Hicks, 509 U.S. 502 (1993); Abel v. Dubberly, 210 F.3d 1334, 1339 (11th

Cir. 2000); Alexander v. Fulton County, 207 F.3d 1303, 1336 (11th Cir. 2000);

Combs, 106 F.3d at 1529-38 (interpreting Hicks and the post-Hicks case law);

Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 920-21 (11th Cir. 1993).

To establish a prima facie case of retaliation a plaintiff must show:  (1) that

he engaged in protected activity; (2) that his employer was aware of that activity;

(3) that he suffered an adverse employment action; and (4) there was a causal link

between his protected activity and the adverse employment action.  Maniccia v.

Brown, 171 F.3d 1364, 1369 (11th Cir. 1999) (citing Little v. United Techs., 103

F.3d 956, 959 (11th Cir. 1997)).  The burden-shifting framework outlined above

for discrimination claims also applies to retaliation claims.

Washington contends that, in violation of Title VII and § 1981, he was

retaliated against for complaining of race discrimination when he was demoted

from the meat department to a position at the front of the store, which included

bagging groceries and collecting shopping carts.  Kroger argues that Washington

did not establish a prima facie case of retaliation because he did not establish that

---

[15]  The court in Chapman modified the statement in Combs contrary to this holding in
Reeves after noting that the standard for granting summary judgment mirrors the standard for
judgment as a matter of law.  See Chapman, 229 F.3d at 1025, n.11.

he suffered an adverse employment action and the necessary causal connection.

Even if Washington can establish a prima facie case, Kroger contends that it

transferred Washington for a legitimate, nondiscriminatory reason, and that

Washington failed to establish pretext.

### 1.  Adverse Employment Action

An adverse employment action is an ultimate employment decision, such as

discharge or failure to hire, or other conduct that "alters the employee's

compensation, terms, conditions, or privileges of employment, deprives him or her

of employment opportunities, or adversely affects his or her status as an

employee." Gupta , 212 F.3d at 587.  Conduct that falls short of an ultimate

employment decision must meet "some threshold level of substantiality . . . to be

cognizable under the anti-retaliation clause," Wideman v. Wal-Mart Stores, Inc.,

141 F.3d 1453, 1456 (11th Cir. 1998), and "an employee must show a serious and

material change in the terms, conditions, or privileges of employment." Davis v.

Town of Lake Park, Fla., 245 F.3d 1232, 1239 (11th Cir. 2001).  Whether an

action is sufficient to constitute an adverse employment action for purposes of a

retaliation claim must be determined on a case-by-case basis, using both a

subjective and an objective standard.  See Gupta, 212 F.3d at 587; Doe v. Dekalb

County Sch. Dist., 145 F.3d 1441, 1448-49 (11th Cir. 1998).

32

Washington argues that he was demoted when Kroger transferred him to work in the front of the store. Kroger argues that Washington was not demoted, but that he was transferred to a different position within the store, and that the transfer was not an adverse employment action.

It is undisputed that Washington was hired as a store clerk and that his position as a store clerk never changed. What changed was his placement in the store. Before his complaint of harassment, he worked in the meat department. After his complaint of harassment, he worked in the front of the store as a cashier and bagger. The collective bargaining agreement specifically allowed for Kroger to move store clerks throughout the store. His transfer was therefore just that, a transfer. Washington's characterization of it as a demotion is inaccurate.

Transferring an employee to a different position or location can be an adverse employment action. See Hinson v. Clinch County Ga. Bd. of Educ., 231 F.3d 821, 829 (11th Cir. 2000). Washington alleges that his hourly rate was reduced, that the position in the front of the store had less prestige because of the duties it entailed, and that his duties decreased. Kroger admits that his hourly rate changed and does not discuss the prestige of his new placement or Washington's duties. The court find that Washington presented sufficient evidence to establish that his transfer was an adverse employment action.

33

2. <u>Causal Connection</u>

To establish a causal connection between participation in a protected activity and adverse employment action, "a plaintiff need only show that the protected activity and the adverse action were not wholly unrelated." <u>Brungart v. BellSouth Telecomms., Inc.</u>, 231 F.3d 791, 799 (11th Cir. 2000) (quotations omitted). To make this showing, a plaintiff must generally establish "that the decision maker was aware of the protected conduct at the time of the adverse employment action." <u>Id.</u>   Although close temporal proximity between the employee's protected conduct and the adverse employment action may be sufficient to create a genuine issue of material fact of a causal connection, <u>id.</u>, "[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close." <u>Clark County Sch. Dist. v. Breeden</u>, 532 U.S. 268, 273, 121 S. Ct. 1508, 1511 (2001) (internal quotations omitted).

Here, Washington has not shown sufficient temporal proximity between his complaints to his employer and his transfer as to establish causation. <u>See id.</u>  The evidence shows that Washington complained of harassment on September 1, 2001 and was transferred in February 2002. This five-month period between the two

34

events is not so "very close" as to establish the necessary temporal proximity. <u>See</u>

<u>Clark County</u>, 532 U.S. at 273, 121 S. Ct. at 1511 (relying on cases that held a

three-month period and a four-month period insufficient in holding a 20-month

period insufficient to suggest causality). The five-month period between

Washington's complaint of harassment and his demotion falls outside the

parameters for establishing causation.

### 3. <u>Legitimate, Nondiscriminatory Reason and Pretext</u>

Even assuming that Washington did establish a prima facie case of

discrimination, he has failed to rebut Kroger's legitimate, nondiscriminatory

reason for his transfer.  Kroger transferred Washington to work in the front of the

store because of its reorganization.  The reorganization forced Kroger to schedule

fewer employees to work and to terminate some employees.  Moreover,

Washington's hourly rate was reduced because Washington was in school and

unavailable to work certain hours.  Under the collective bargaining agreement,

therefore, his hourly rate had to be reduced because of the number of hours he

worked.[16]  As evidence of pretext, Washington states that a clerk hired after

Washington, Mike Edwards, remained in the meat department after Washington

---

[16] Under the collective bargaining agreement, Washington's hours placed him on part-time status, thus changing his hourly rate.

was transferred.  Washington contends that the difference in treatment between him and "a less senior clerk" establishes pretext.  (Pl. Br. at 52.)

Washington failed to establish that his transfer was a product of unlawful retaliation.  As Kroger correctly notes in is reply brief, Washington "fail[ed] to address that his school schedule impacted his availability for work."  Simply because Hawkins, an African American, was retained in the meat department does not rebut Kroger's reasons for transferring Washington.  Washington retains the ultimate burden of proving that his transfer was in retaliation for his complaints of racial harassment.  He has failed to carry this burden.  Kroger, therefore, is entitled to summary judgment as to Washington's retaliation claim.

## C.  Constructive Discharge

Washington contends that he was constructively discharged based on the alleged hostile work environment and racial harassment in violation of Title VII and § 1981.[17]  Kroger argues, however, that Washington cannot establish a prima facie case of constructive discharge.  The court agrees with Kroger.

To maintain a constructive discharge claim based on hostile work environment, Washington must show that his working conditions were "so

---

[17]  Both of these statutes have the same requirements of proof and use the same analytical framework.  The court, therefore, will explicitly address the Title VII claim with the understanding that the analysis applies to the § 1981 claim as well.  Standard, 161 F.3d at 1330.

difficult . . . that a reasonable person would have felt compelled to resign."

Pipkins v. City of Temple Terrace, Fla., 267 F.3d 1197, 1201 (11th Cir.2001)

(internal quotation marks and citations omitted).  "The standard for proving

constructive discharge is higher than the standard for proving a hostile work

environment."  Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1231 (11th

Cir.2001).   As explained above, Washington failed to meet even the standard for a

hostile work environment.  He, therefore, cannot meet the higher standard for

constructive discharge.

Moreover, Washington testified that, after the incident on September 1,

2001, no one at Kroger treated him in a racially harassing or discriminatory

manner.  (Pl. Dep. at 266.)  Washington resigned on August 21, 2002, almost a

year after the alleged harassment.  He had not worked with Dean since September

21, 2001.  As such, the court concludes that he has not established that his

working conditions were so intolerable that a reasonable person would have been

compelled to resign.  Summary judgment is due to be granted as to this claim.

## V.  Conclusion

In summary, the court finds that no material issues of fact remain and that

defendant The Kroger Co. is entitled to judgment as a matter of law as to all

claims asserted by plaintiff.

37

A separate order will be entered.

**DONE** this the 17th day of October, 2005.

**VIRGINIA EMERSON HOPKINS**
United States District Judge